IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-184-FL

| | | |
|---|---|---|
| LSTAR DEVELOPMENT GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN J. VINING, WILLIAM | ) | ORDER |
| HAMPTON PITTS, PATRICK "PETE" | ) | |
| SULLIVAN, RACHEL E. | ) | |
| VRADENBURGH, and OAK CITY | ) | |
| DEVELOPMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court upon motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), filed by defendants William Hampton Pitts ("Pitts"), Patrick "Pete" Sullivan ("Sullivan"), Rachel E. Vradenburgh ("Vradenburgh") (DE 29) and defendants Oak City Development, LLC ("Oak City") and Steven J. Vining ("Vining") (DE 31). The issues raised have been briefed fully, and in this posture, are ripe for ruling. Defendants' motions are granted in part and denied in part, as set forth herein.

## STATEMENT OF THE CASE

Plaintiff commenced this action May 1, 2020, and filed the operative amended complaint on September 25, 2020, against defendant Oak City and the individual defendants, former employees of plaintiff and current members and managers of defendant Oak City. Plaintiff asserts claims under the Lanham Act for trademark infringement, false designation of origin, and false advertising, as well as state law claims for unfair and deceptive trade practices, common law unfair

competition and infringement, bad faith, breach of fiduciary duty and conflict of interest, misappropriation of trade secrets, breach of contract, tortious interference with contract, tortious interference with prospective economic advantage, constructive trust, trespass to chattels, conversion and accounting, money had and received, unjust enrichment, and civil conspiracy.[1] Plaintiff seeks declaratory and injunctive relief; compensatory and punitive damages; and costs, fees, and interest.

On June 30, 2020, the court entered a consent injunction, memorializing the parties' agreement that defendants Pitts, Sullivan, and Vradenburgh will not infringe upon any of plaintiff's copyrighted materials, misrepresent that plaintiff's services and accomplishments belong to any other person or entity, violate or induce violations of their post-employment restrictive covenants, or publish or reveal any of plaintiff's confidential information, during the pendency of the instant action.

In their instant motion to dismiss, defendants Pitts, Sullivan, and Vradenburgh seek dismissal of plaintiff's Lanham Act claims and related state law claims for failure to state a claim upon which relief can be granted, and request that the court decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims. In making their arguments defendants Pitts, Sullivan, and Vradenburgh rely upon defendants Pitts and Vradenburgh's employment agreements.

In their instant motion to dismiss, defendants Oak City and Vining join defendants Vradenburgh, Pitts, and Sullivan's motion and also seek to dismiss plaintiff's breach of fiduciary duty and conflict of interest claim, asserted against defendant Vining only. On November 18, 2020, plaintiff voluntarily dismissed without prejudice its claims for tortious interference with

---

[1] Plaintiff's claims are asserted against all defendants, except its claim for breach of fiduciary duty and conflict of interest, which is asserted against defendant Vining only.

2

prospective economic advantage and unjust enrichment. Plaintiff responded in opposition to the motions to dismiss, and defendants have replied.[2]

**STATEMENT OF FACTS**

The facts alleged in plaintiff's amended complaint may be summarized as follows. Plaintiff manages, develops, and sells residential, commercial, and mixed-use development communities for its affiliated company, LStar Management, LLC ("LStar Management"), and other investment partners. (Am. Compl. ¶ 11). Plaintiff was founded in 2011 by Kyle Corkum ("Corkum"), who remains plaintiff's president, sole director, and majority shareholder. (Id. ¶¶ 11, 23). Around the time of plaintiff's incorporation, Corkum's attorney, defendant Vining, allegedly implemented a scheme to take advantage of Corkum, persuading Corkum to issue Vining twenty percent of plaintiff's stock and appoint him as the vice-present, secretary, treasurer, and director of plaintiff. (Id. ¶ 25).

On June 2, 2011, defendant Sullivan accepted employment with plaintiff in the capacity of vice-president. (Id. ¶ 27). Then, on or about April 6, 2015, plaintiff hired defendant Pitts as its chief operating officer, and it hired defendant Vradenburgh as its vice-president of human resources on May 5, 2016. (Id. ¶¶ 26, 28). In their employment agreements, defendants Pitts and Vradenburgh agreed, among other things, to maintain the confidentiality of plaintiff's trade secrets and to decline all employment and ownership opportunities in any business or enterprise that competes with plaintiff. (Id.).

In or around 2015, plaintiff obtained the rights to manage and develop a real estate asset located outside of Boston, Massachusetts, known as Union Point. (Id. ¶ 29). In order to provide

---

[2]     On December 4, 2020, plaintiff moved to consolidate this action with related case <u>Pitts et al v. LStar Development Group, Inc. et al</u>, 5:20-CV-525-FL (E.D.N.C) (hereinafter "the related wage and hour case"), which the court denied on March 15, 2021. Also on December 4, 2020, plaintiff moved to amend its amended complaint, but subsequently withdrew that motion on December 17, 2020.

3

hands-on management of the Union Point development, Corkum relocated to Massachusetts, while the individual defendants remained at plaintiff's headquarters in Raleigh, North Carolina. (Id.). Shortly thereafter, the individual defendants allegedly conspired to misappropriate plaintiff's money, property, and business opportunities for their personal benefit, and remove Corkum from his position of power. (Id. ¶ 30). Corkum discovered defendants' alleged scheme in 2018, when defendant Vining sent Corkum legal notice that he had been removed from the LStar business enterprise in all official capacities. (Id. ¶ 31). Around that time, the individual defendants allegedly caused plaintiff to terminate Corkum's salary and employment benefits, including his family's health insurance, and terminated Corkum's access to planitiff's trade secrets and intellectual property. (Id.).

When Corkum attempted to assert his legal rights, the individual defendants allegedly caused LStar Management to commence a civil action and arbitration proceeding against Corkum, seeking a judicial declaration that Corkum's removal was proper. (Id. ¶ 33). Fearing that Corkum would be reinstated as plaintiff's president, the individual defendants also allegedly implemented a scheme to divert plaintiff's future business opportunities to a company owned and controlled by defendants. (Id. ¶ 34). In furtherance of that goal, the individual defendants filed the articles of incorporation for defendant Oak City, allegedly using plaintiff's money to pay the filing fee, and became the sole members, managers, and employees of defendant Oak City. (Id.).

Shortly thereafter, the individual defendants allegedly began using plaintiff's equipment, money, and intellectual property to divert plaintiff's business opportunities to defendant Oak City. (Id. ¶ 35). Among other things, defendants allegedly issued a development proposal to the City of Glenwood Springs, wherein defendants allegedly stated that defendant Oak City was well capitalized and had developed three real estate developments, when plaintiff actually capitalized

and developed those projects. (Id. ¶ 35.3). The proposal, which was attached to the amended complaint, included the following cover letter:



May 21, 2019

City of Glenwood Springs
Procurement Department, First Floor
101 W. 8th Street
Glenwood Springs, CO 81601

Re: Master Developer for Confluence Area #BD 2019-013

To Whom it May Concern:

On behalf of the Confluence Development Group, I am excited to submit the following proposal for a Master Developer for the Confluence Area in Glenwood Springs, Colorado. The Confluence Development Group is a partnership between ABA Hospitality located in Snowmass Village, Colorado and Oak City Development out of Raleigh, North Carolina. Our combined group has completed over $10 billion in real estate development and investments over a 30-year period, specializing in master planned communities, hospitality, residential, and mixed-use properties. We are a strong locally based group with several of our key team members residing in the Roaring Fork Valley for over 30 years. Our teams commitment to the Valley extends to numerous real estate investments, which include the Snowmass Club and recent acquisition of the Tree Farm property near Basalt, Colorado.

As a Master Developer of numerous projects and communities, our experience has led us to believe that the best development plans are the result of legitimate engagement and collaboration with community stakeholders and municipal officials. We have assembled a world class team of Colorado based design professionals, engineers, and consultants that have the unique skill set, relevant project experience, and qualifications to develop the right master plan for the site, with the development and investment team to execute that plan to the highest standards.

We are very optimistic about the opportunities that the Confluence area site presents on a local and regional level. Our proposal demonstrates our teams qualifications and financial capacity, with references and a history of successfully completed projects The high level concept plan provides a foundational layer to explore and discuss some of our initial thoughts and ideals in regards to the development potential for the site.

Thank you for allowing us to submit this proposal to the City of Glenwood Springs. If you have any questions or require additional information, please feel free to contact me anytime.

Cordially,

Scott Brown
Chief Executive Officer
ABA Hospitality, llc

5

(Development Proposal (DE 27-2) at 3). Moreover, the proposal allegedly incorporated identical

text and pictures that plaintiff uses to promote its Grand Dunes real estate development in Myrtle

Beach, South Carolina, and its Savannah Quarters real estate development in Pooler, Georgia.

(Am. Compl. ¶¶ 11, 35.3). The figures below, which were also attached to the amended complaint,

provide a side-by-side comparison of plaintiff's text and pictures and defendants' alleged proposal.



(Comparison Pictures (DE 27-1) at 2).



(Id. at 4).

On March 25, 2020, the individual defendants allegedly arranged a telephone conference with one of plaintiff's largest development partners, after which the development partner allegedly terminated its relationship plaintiff, causing plaintiff to lose substantial management fees.  (Id. ¶ 39). The next day, Corkum obtained copies of plaintiff's articles of incorporation and by laws, which allegedly confirmed that defendants lacked authority to remove him from his positions.  (Id. ¶ 38).  Accordingly, Corkum convened a meeting of plaintiff's board of directors, during which he and co-director Jeffrey Milligan ("Milligan") adopted resolutions terminating defendants Vining and Sullivan as officers and agents of plaintiff, and the following day, Corkum terminated defendants Pitts's and Vradenburgh's employment.  (Id.).  On April 28, 2020, during a meeting

7

with plaintiff's shareholders, Corkum and Milligan removed defendant Vining as member of plaintiff's board of directors. (Id. ¶ 41). When the individual defendants vacated plaintiff's premises, they each allegedly took plaintiff's property, including computers and smart phone devices. (Id. ¶ 40).

Additional facts pertinent to the instant motions will be discussed in the court's analysis.

## COURT'S DISCUSSION

A. Standards of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).[3]

B. Analysis

    1.    Lanham Act Claims

        a.    Infringement

Defendants move to dismiss plaintiff's Lanham Act claim for trademark infringement, arguing that plaintiff fails to identify a registered trademark, or any particular trademark, that has

---

[3]     In the event that the court dismisses plaintiff's federal claims, defendants also ask the court to decline to exercise supplemental jurisdiction over state law claims under Rule 12(b)(1).

been infringed. "[E]ven if a trademark is not federally registered, it may still be enforceable under § 43(a) of the Lanham Act, which creates a federal cause of action for trademark infringement." Matal v. Tam, 137 S. Ct. 1744, 1752 (2017). Indeed, "it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992) (internal quotations and citations omitted).

The Lanham Act defines a trademark as "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. "To ascertain whether a mark is protected, [the court] must determine whether it is (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." Ale House Mgmt., Inc. v. Raleigh Ale House, Inc., 205 F.3d 137, 140 (4th Cir. 2000) (citation omitted).

At one end of the spectrum is the generic mark, which "describes a product in its entirety, and, therefore, neither signifies the source of goods nor distinguishes the particular product from other products on the market." George & Co. LLC v. Imagination Ent. Ltd., 575 F.3d 383, 394 (4th Cir. 2009) (citations and quotations omitted). A "generic mark is never entitled to trademark protection." Id. Next are descriptive marks, which "define a particular characteristic of the product in a way that does not require any exercise of the imagination", such as "After Tan post-tanning lotion" and "5 Minute glue." Id. (citations omitted). A descriptive mark "can only be protected if it has acquired secondary meaning, *i.e.* if it has become distinctive of the maker's goods over time." Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd., 187 F.3d 363, 369 (4th Cir. 1999).

In contrast, "[s]uggestive marks connote, without describing, some quality, ingredient, or characteristic of the product." Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996). Finally, "[b]oth arbitrary and fanciful marks are totally unrelated to the product; the two differ, however, in that a mark qualifies as arbitrary if it is well-known in a different context, and fanciful if it is newly invented." Ashley Furniture, 187 F.3d at 369. "[S]uggestive, arbitrary, and fanciful marks are deemed inherently distinctive and are entitled to protection." Id.

Here, plaintiff alleges, in general terms, that:

> "[t]o identify and promote the source, origin, and sponsorship of plaintiff and the services it offers and the real estate developments it manages and to distinguish plaintiff and its services from those offered or sold by others, plaintiff has extensively utilized trademarks, service marks, trade names, logos, emblems and indicia of origin for various real estate developments that it manages ("the LStar Marks").

(Am. Compl. ¶ 13) (parenthesis in original). Although plaintiff uses the term "LStar Marks" repeatedly throughout its amended complaint, it never specifies what those trademarks or service marks are. (See, e.g., id. ¶¶ 14-16, 46-47, 50, 57). In briefing, plaintiff argues that defendants "directly copied the very marks plaintiff uses to describe its services and the real estate development projects that it has developed and managed . . . without so much as editing the text or pictures", (Mem. (DE 37) at 9-10), and it cites an attachment to the amended complaint that provides a side-by-side comparison of a website and defendants' alleged proposal, highlighting the identical paragraphs and pictures. (Id.). However, plaintiff does not identify a particular word, name, or symbol, or combination thereof, within the highlighted paragraphs, as the alleged trademark(s).

As the United States Court of Appeals for the Fourth Circuit has held:

> Not every single word [or] phrase . . . that appears on a label or in an advertisement qualifies as a protectable mark. If a purported mark fails to identify its source, it is not protectable—under state or federal law . . . [A] plaintiff must show that it has

10

> actually used the designation at issue as a trademark; thus the designation or phrase must be used to perform the trademark function of identifying the source of the merchandise to the customers.

MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 341 (4th Cir. 2001) (internal quotations and citations omitted)). Nothing on the website in the first two pages of the attachment identifies plaintiff or any other "LStar" entity as the source of the real estate developments. Therefore, the court cannot conclude that plaintiff has used any of the words, phrases, or symbols on the website as a trademark.

In the second attachment, the term "LStar Ventures" appears at the top of the picture of the website. (Comparison Pictures (DE 27-1) at 4). This term could qualify as a trademark because it identifies plaintiff as the source of the real estate developments. However, plaintiff does not allege that defendants have ever used the term "LStar Ventures", and defendants' alleged proposal, which is attached to the amended complaint, does not reference the term "LStar Ventures" or any similar term. Therefore, plaintiff fails to state a claim for trademark infringement on the basis of the term "LStar Ventures." See Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012) (explaining that a defendant's use of the mark, or "an imitation of it", is an element of trademark infringement).

For all these reasons, defendants' motion to dismiss is granted in this part, and plaintiff's claim for trademark infringement under the Lanham Act is dismissed without prejudice.

        b.    False Advertising

Defendants move to dismiss plaintiff's Lanham Act claim for false advertising. The Lanham Act prohibits the "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or

commercial activities[.]" 15 U.S.C. § 1125(a)(1). To state a claim for false advertising, plaintiff must allege:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

Verisign, Inc. v. XYZ.COM LLC, 848 F.3d 292, 298–99 (4th Cir. 2017) (Design Res., Inc. v. Leather Indus. of Am., 789 F.3d 495, 501 (4th Cir. 2015)).

A plaintiff may plausibly allege the first prong of the test when "the contested statement or representation [is] . . . false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." PBM Prod., LLC v. Mead Johnson & Co., 639 F.3d 111, 120 (4th Cir. 2011) (citing C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P., 131 F.3d 430, 434 (4th Cir.1997)). "Where the advertisement is literally false, a violation may be established without evidence of consumer deception." Id. (citation omitted). "In analyzing whether an advertisement . . . is literally false, a court must determine, first, the unambiguous claims made by the advertisement . . . and second, whether those claims are false." Scotts Co. v. United Indus. Corp., 315 F.3d 264, 274 (4th Cir. 2002) (citation omitted). "A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." Id.

Plaintiff plausibly alleges a claim for false advertising. By listing the Grand Dunes Savannah Quarters, and the Sycamore Hills development real estate developments under the heading "Oak City Representative Developments", the proposal necessarily implies that defendant

Oak City developed those properties. (Am Compl. ¶¶ 35.3-35.4; Development Proposal (DE 27-2) at 7-8). Plaintiff alleges that this statement is literally false because plaintiff, rather than defendant Oak City, developed and financed the projects. (Id. ¶ 35.4). Taking plaintiff's allegations as true, this unambiguous statement is literally false, and therefore, plaintiff need not allege customer confusion. Moreover, because the statement references defendant Oak City's representative developments, it is likely to influence a prospective client's decision to work with defendant Oak City in the future. Finally, it can be reasonably inferred that the development proposal was sent to the City of Glenwood Springs by either United States Mail or email, satisfying the interstate commerce prong. See, e.g., Boykin Anchor Co. v. AT & T Corp., 825 F. Supp. 2d 706, 710 (E.D.N.C. 2011) ("[T]he [false advertising] statement was placed in interstate commerce (via the internet and email)." (parenthesis in original)).

Defendants argue plaintiff fails to plausibly allege that defendants placed the statement into interstate commerce, since the proposal's cover letter was signed by Scott Brown ("Brown"), the chief executive officer of ABA Hospitality, Inc. However, the cover letter explicitly states that Brown is submitting the proposal on behalf of the Confluence Development Group ("Confluence"), "which is a partnership between ABA Hospitality located in Snowmass Village, Colorado and Oak City Development out of Raleigh, North Carolina," and the proposal includes biographies of the individual defendants. (Development Proposal (DE 27-2) at 3, 7-8). This information suggests a plausible inference of defendants' knowing or intentional participation in drafting and submitting the proposal, which is sufficient to state a claim for contributory false advertising. See, e.g., Duty Free Ams., Inc. v. Estee Lauder Cos., Inc., 797 F.3d 1248, 1277 (11th Cir. 2015) ("In order to state a contributory false advertising claim . . . the plaintiff must show that a third party in fact directly engaged in false advertising that injured the plaintiff. Second, the

plaintiff must allege that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it."); SMD Software, Inc. v. EMove, Inc., No. 5:08-CV-403-FL, 2013 WL 12167730, at *9 (E.D.N.C. Apr. 30, 2013) ("Contributory false advertising under the Lanham Act is actionable. . . Federal courts have found that such joint tortfeasor liability is available only where a defendant has "at least constructive knowledge of the . . . false advertising." (citations omitted)). [4]

Defendants also argue that plaintiff fails to plausibly allege the fifth element, injury, relying upon Wall & Assocs., Inc. v. Better Bus. Bureau of Cent. Virginia, Inc., 685 F. App'x 277 (4th Cir. 2017). However, Wall is inapposite. In that case, the plaintiff alleged that defendant falsely stated plaintiff's business was rated on an unbiased and objective scale, whereas, in reality, its ranking was based on subjective and biased criteria. Id. at 279. Because plaintiff failed to plausibly allege that customers relied upon the rating system being objective and unbiased, the court concluded that plaintiff "did not adequately allege the necessary proximate cause between its alleged injury and Defendants' allegedly violative conduct." Id.

Here, in contrast, the alleged false statement and alleged injury are far less attenuated. Unlike in Wall, where it was unclear if objective ratings drive consumer behavior, here it can be reasonably inferred that defendants' alleged false statement, taking credit for the development of

---

[4]     Moreover, in construing the Lanham Act, "courts routinely have recognized the propriety of examining basic tort liability concepts to determine the scope of liability." Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1433 (3d Cir. 1994) (collecting cases). Under principles of agency law, the submission of the proposal is binding on Confluence, as long as the proposal was within the scope of Confluence's usual business. See generally Ron Medlin Const. v. Harris, 364 N.C. 577, 582–83 (2010) ("Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, . . . for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." (citation omitted)). Additionally, because "partners in a partnership are not insulated from liability . . . and no corporate veil exists between a general partnership and its partners", id. at 583 (citation omitted), the proposal is binding on defendant Oak City as well, if Confluence is a general partnership.

14

plaintiff's projects in order to obtain the business of a prospective client, is likely to harm plaintiff, either by direct diversion of sales, a lessening of goodwill, or both.

Accordingly, defendants' motion to dismiss is denied in this part.

c.     False Designation of Origin

Section 43(a) of the Lanham Act prohibits a "false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association . . . as to the origin" of "goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A). The amended complaint claims that defendants made false statements of association and origin, (see Am. Compl. ¶ 46), but plaintiff has not articulated a particular theory of relief. The court agrees with defendants that plaintiff fails to state a claim for false designation of origin based on the theory of "passing off", which "occurs when a producer misrepresents his own goods or services as someone else." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 n. 1, (2003) (citations omitted). Defendants' motion to dismiss thus is granted in this part.

However, plaintiff's allegations permit a plausible inference of liability under a theory of reverse passing off, which is a "type of false designation of origin" that "occurs when a 'producer misrepresents someone else's goods or services as his own.'" Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 438 (4th Cir. 2010) (quoting Dastar, 539 U.S. at 28 n. 1)). To state a claim for reverse passing off, a plaintiff must allege that "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." Belmora LLC v. Bayer Consumer Care AG, 819 F.3d 697, 710 (4th Cir. 2016) (citing Universal Furniture Int'l, 618 F.3d at 438. "Thus, the plaintiff in a reverse passing off case must plead and prove only that the

work 'originated with' him—not that he used the work (which may or may not be associated with a mark) in U.S. commerce." Id. (parenthesis in original).

Here, plaintiff alleges that it financed and developed the Grand Dunes, Savannah Quarters, and Sycamore Hills projects, allowing the inference that it is the origin of these real estate development services. (Am. Compl. ¶ 35.4).[5] Moreover, by indicating that defendant Oak City developed the real estate projects, defendants allegedly falsely designated the origin of real estate development services. (Id. ¶¶ 35.4, 46). Third, plaintiff plausibly alleges that consumers are likely to be confused by defendants' statement. (Id. ¶ 49); see Universal Furniture Int'l, 618 F.3d at 438–39 ("[W]hen a 'defendant has taken the plaintiff's product and has represented it to be his own work," it is "difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product." (quoting Johnson v. Jones, 149 F.3d 494, 503 (6th Cir.1998)). Finally, plaintiff plausibly alleges harm. (Am Compl. ¶ 51); see Universal Furniture Int'l, 618 F.3d at 439 ("A significant harm of reverse passing off is that the originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." (citation and quotations omitted)).

Accordingly, defendants' motions to dismiss are denied in this part.

2.      Common Law Unfair Competition and Infringement

Defendants move to dismiss plaintiff's common law unfair competition and infringement claims, arguing that plaintiff fails to identify a particular trademark.

---

[5]      The court also agrees with defendants that plaintiff cannot state a claim for reverse passing off based upon defendants' alleged plagiarism of plaintiff's texts and pictures. See Dastar, 539 U.S. at 38 (holding that Section 43(a) of the Lanham Act does not prevent the unaccredited copying of an uncopyrighted work).

16

The North Carolina common law of unfair competition protects "against the tortious appropriation of tradenames and trademarks alike." Charcoal Steak House, Inc. v. Staley, 263 N.C. 199, 202, (1964). Like its federal counterpart under the Lanham Act, common law unfair competition "is the child of confusion." Id. at 203 (citation omitted). "The gravamen of unfair competition is the protection of a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." Henderson v. U.S. Fid. & Guar. Co., 346 N.C. 741, 749 (1997) (citations omitted).

For purposes of this claim, plaintiff exclusively relies upon defendants' alleged infringement of plaintiff's trademarks and service marks. (Am. Compl. ¶¶ 66-76). As stated in more detail herein, plaintiff fails to identify what those trademarks or service marks are. Therefore, defendants' motion to dismiss is granted in this part, and plaintiff's common law unfair competition and infringement claims are dismissed without prejudice.

3.      Misappropriation of Trade Secrets

Defendants move to dismiss plaintiff's claim for misappropriation of trade secrets. North Carolina General Statute § 66-153 provides that an "owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat. § 55-153. The statute defines "trade secret" as:

> [b]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a.      Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b.      Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

17

Id. § 66-152(3).  Moreover, misappropriation refers to the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret."  Id. § 66-152(1).

To state a claim for misappropriation of trade secrets, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur."  Krawiec v. Manly, 370 N.C. 602, 609 (2018) (citation omitted).  "[A] complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is insufficient to state a claim for misappropriation of trade secrets."  Id. at 610 (citation and quotations omitted).

 For instance, in Krawiec, the North Carolina Supreme Court held that allegations describing trade secrets as simply "original ideas and concepts for dance productions, marketing strategies and tactics, as well as student, client and customer lists and their contact information" were insufficient to state a claim.  Id. at 611.  The court explained that such allegations failed "to put defendants on notice as to the precise information allegedly misappropriated" and were "too general for th[e] Court to determine . . . whether there is [wa]s a 'formula, pattern, program, device, compilation of information, method, technique, or process' at issue that '[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering.'"  Id. (quoting N.C. Gen. Stat. § 66-152(3)(a)).

Here, plaintiff alleges it has "engaged in extensive activities to develop confidential and proprietary business information, business data, and unique methods to operate its business ('the

18

LStar Trade Secrets')", including the following: 1) "examining the relevant market, to among other things, identify and locate potential clients and real estate development"; 2) studying governmental rules and regulations governing real estate development and management and how to proficiently comply with these rules and regulations"; 3) "developing and implementing unique policies and procedures designed to maximize revenues while still providing first class services to its clients"; 4) "setting price points and pricing strategies to maximize efficiency and profitability"; 5) "recruiting a qualified and loyal base of employees to assist in operating and managing plaintiff's business"; 6) "developing and maintaining proprietary databases and information that include economic data germane to plaintiff's ongoing and current business operations as well as historic operational data and information that pertains to the services and real estate developments plaintiff offers"; and 7) "establishing a unique system and style of operation that includes, but is not limited to, methodologies related to promoting and operating the business, business forms, and other valuable internal information." (Am. Compl. ¶¶ 17-17.7) (parenthesis in original). Moreover, plaintiff alleges that it has implemented reasonable measures to protect the confidentiality of the LStar Trade Secrets, such as limiting disclosure except when reasonably necessary, executing non-disclosure agreements, maintaining the LStar Trade Secrets on password protected computer networks, and locking its place of business during non-operating hours. (Id. ¶¶ 19-19.5).

As in Krawiec, these general allegations are insufficient to put defendants on notice as to the precise information allegedly misappropriated. Plaintiff argues that "North Carolina's appellate courts have repeatedly held that cost history records, pricing policies, cost history records [sic], bidding formulas and customer lists constitute protected trade measures",[6] citing six cases

---

[6] Plaintiff also argues that it has sufficiently alleged multiple trade secrets, such as "project acquisition data" and "client lists," citing paragraph 17.1 of the amended complaint. (Mem. DE 37) at 23). Contrary to plaintiff's characterization, however, that paragraph states "examining the relevant market, to among other things, identify and locate potential clients and real estate development." (Am Compl. ¶ 17.1). Plaintiff cannot amend its complaint

from the North Carolina Court of Appeals, all of which predate the North Carolina Supreme Court's decision in Krawiec. (Mem. (DE 37) at 22-23). In Krawiec, however, the North Carolina Supreme Court clarified:

> Provided that the information meets the two requirements for a trade secret as defined in subsection 66-152(3), we agree with the determination of the Court of Appeals that information regarding customer lists, pricing formulas and bidding formulas can qualify as a trade secret under G.S. § 66-152(3). We are persuaded by the fact that other jurisdictions have reached the same conclusion. However, in light of the requirements of subsection 66-152(3), a customer database d[oes] not constitute a trade secret when the record show[s] that defendants could have compiled a similar database through public listings such as trade show and seminar attendance lists.

Krawiec, 370 N.C. at 610 (internal quotations and citations omitted). Here, as in Krawiec, plaintiff's allegations do not satisfy the requirements in North Carolina General Statute § 66-152(3), where plaintiff fails to allege that the LStar Trade Secrets could not be complied through independent development. To the contrary, that certain LStar Trade Secrets are derived from "examining the relevant market" (Am. Compl. ¶ 17.1), and "studying governmental rules and regulations governing real estate development and management", (id. ¶ 17.2), suggests that they are readily ascertainable through independent development.

Plaintiff also argues that defendants expressed no confusion when they entered a consent injunction in this case agreeing to maintain the confidentiality of "Trade Secrets" which were defined as "documents and data containing any of the following information owned by plaintiff: customer lists, vendor, lists, contracts, marketing methods, marketing materials, financial information, financial strategies, analytic tools, investor identities, financial statements, real estate investments, property development plans or goal or strategies, and research and development

---

through briefing. See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing . . ." ).

materials." (Mem. (DE 37) at 23-24). As an initial matter, the parties' consent order specifically stated that "Plaintiff and Defendants have conferred and agreed to resolve certain matters by consent to avoid the burden and expense of formal Preliminary Injunction proceedings" and defendants "deny that there is appropriate legal basis for the Court to enter a preliminary injunction." (Order (DE 24) 1-2). More importantly, however, the court's present inquiry is confined to the allegations in the amended complaint. The definition of terms in the consent order, and defendants' purported understanding of the same, do not bear on this inquiry.

Finally, plaintiff argues that it will be able to identify specific misappropriations once discovery commences and it obtains access to its computers and smart phones that defendants allegedly took when they vacated plaintiff's premises. However, the "doors of discovery" do not unlock "for a plaintiff armed with nothing more than conclusions." Iqbal, 556 U.S. at 678.

For all these reasons, defendants' motion to dismiss is granted in this part, and plaintiff's claim for misappropriation of trade secrets is dismissed without prejudice.

4.      Tortious Interference with Contract

Defendants move to dismiss plaintiff's tortious interference with contract claims.[7] To state a claim for tortious interference with contract, plaintiff must allege:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

Krawiec, 370 N.C. at 606–07 (quoting United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661 (1988)). For purposes of second element, it is not enough to allege broadly that defendant had

---

[7]      Defendants also move to dismiss plaintiff's claim for tortious interference with prospective economic advantage; however, plaintiff voluntarily dismissed that claim after defendants filed the instant motion to dismiss.

knowledge of the contract, rather, a complaint must contain "facts sufficient to make a good claim that the defendant[ ] knew of the contract[ ] at issue." Id. at 607.

Here, plaintiff alleges that it "is a party to lawfully enforceable employment agreements with defendants Pitts and Vradenburgh. Furthermore, plaintiff was, upon information and belief, a party to lawfully enforceable management contracts with investment partners." (Am. Compl. ¶ 112). Plaintiff also alleges that "[d]efendants engaged in course of action and in and pattern of conduct designed to intentionally interfere with an destroy these contractual relationships and advantages by, among other things, inducing the defendants Pitts and Vrandenburgh to breach their employment agreements and causing at least one investment partner to terminate its longstanding business relationship with plaintiff." (Id. ¶ 113).[8] However, the amended complaint is devoid of any reference to the second element, defendants' knowledge of the contracts at issue. Therefore, plaintiff fails to state a claim for tortious interference with contract.

With respect to defendants Vradenburgh's and Pitts's employment contracts, plaintiff argues that, since two of the defendants had written employment contracts, defendants should have "suspected their co-defendants might have had employment contracts as well." (Mem. (DE 37) at 26). Merely suspecting that someone might have an employment contract does not satisfy the knowledge element. Moreover, contrary to plaintiff's suggestion in briefing, plaintiff cannot impute knowledge to defendants Vradenburgh, Pitts, and Sullivan merely based on allegations that they were "highly compensated senior executive officers." (Id.). Finally, regarding the alleged contract with the "investment partner", plaintiff does not identify the investment partner or the nature of its contractual obligation to plaintiff, let alone defendants' knowledge of the same.

---

[8] Plaintiff clarifies in briefing that it is not asserting claims against Pitts and Vradenburgh for interfering with their own contracts, but rather, for allegedly interfering with each other's contracts.

Accordingly, defendants' motion to dismiss is granted in this part, and plaintiff's claim for tortious interference with contract is dismissed without prejudice.

5.    Unfair and Deceptive Trade Practices

Defendants move to dismiss plaintiff's claim for unfair and deceptive trade practices. In North Carolina, [u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). In order state a claim for unfair and deceptive trade practices, "a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton, 353 N.C. at 656. "The determination of whether an act or practice is an unfair or deceptive practice that violates [N.C. Gen. Stat.] § 75–1.1 is a question of law for the court." Gray v. N. Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 68 (2000).

"[A] practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required." Marshall v. Miller, 302 N.C. 539, 548 (1981). For purposes of the Unfair and Deceptive Trade Practices Act, "the term 'commerce' [] mean[s] 'business activities.' 'Business activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 594 (1991).

Here, plaintiff has alleged facts meeting the elements of an unfair and deceptive trade practices claim. First, the proposal's listing of the Grand Dunes, Savannah Quarters, and Sycamore Hills developments under the heading "Oak City Representative Development", has the tendency to deceive, where plaintiff alleges it financed and developed those projects. Second, the

23

proposal, which was sent to a prospective client in the real estate market, affected commerce. Finally, it can be reasonably inferred that an alleged false statement, taking credit for the development of plaintiff's projects in order to obtain the business of a prospective client in the real estate market, is likely to harm plaintiff. Therefore, plaintiff states a claim for unfair and deceptive trade practices. See Ellis v. N. Star Co., 326 N.C. 219, 225 (1990) ("We have concluded, for example, that both false advertising and fraud violate [N.C.G.S. § 75–1.1].") (citation omitted)); State ex rel. Edmisten v. J.C. Penney Co., 292 N.C. 311, 318 (1977) ("Cases involving unfair or deceptive practices include false advertising, misnaming and misrepresentation, misleading trade or products names, [and] simulation of well known products or trade names.") (citation omitted); Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90, 98–99 (1985) (holding that a violation of North Carolina General Statute §§ 95–47.6(2), which prohibits the "publish[ing] or caus[ing] to be published any false or fraudulent information, representation, promise, notice or advertisement" "constituted unfair and deceptive acts or practices in violation of N.C.G.S. § 75–1.1").

In support of dismissal, defendants argue that the development proposal contained positive statements about defendant Oak City, not negative statements about plaintiff.[9] This argument is beside the point. The statement at issue must be deceptive, not disparaging of plaintiff.

Accordingly, defendants' motion to dismiss is denied in this part.

6.      Bad Faith

---

[9]      Defendants' remaining arguments for dismissal of this claim relate to whether plaintiff's allegations regarding trademark infringement, misappropriation of trade secrets, tortious interference with contract, embezzlement, and larceny constitute unfair and deceptive trade practices. Where the court finds that plaintiff's false advertising allegations state a claim for unfair and deceptive trade practices, the court does not reach defendants' remaining arguments for dismissal of this claim.

Defendants Pitts and Vradenburgh, move to dismiss plaintiff's claims for bad faith, asserted under North Carolina General Statute § 55-8-42, on grounds that defendants Pitts and Vradenburgh were not corporate officers.[10]

Under the North Carolina Business Corporation Act, corporate officers with discretionary authority must discharge their duties: "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner he reasonably believes to be in the best interests of the corporation." N.C. Gen. Stat. § 55–8–42(a). For purposes of this statute, "[a] corporation has the officers described in its bylaws or appointed by the board of directors in accordance with the bylaws." N.C. Gen. Stat. § 55-8-40(a).

Here, plaintiff alleges that "defendants were each senior executive officers employed by plaintiff . . . [w]hile they were serving as officers of plaintiff, defendants engaged in bad faith conduct and have otherwise violated N.C. GEN. STAT. § 55-8-42 . . ." (Am. Compl. ¶¶ 79-80). However, plaintiff does not allege that defendants Vrandenburgh and Pitts were described in its bylaws or appointed by the board of directors in accordance with the bylaws, as required by North Carolina General Statute § 55-8-40(a). This suggests that defendants Vradenburgh and Pitts were not officers within the meaning of the North Carolina Business Corporation Act.

Moreover, the manner in which defendants Vradenburgh and Pitts were terminated, in comparison to manner in which defendants Sullivan and Vining were terminated, suggests that defendants Vradenburgh and Pitts were not corporate officers. Specifically, plaintiff alleges that its board of directors adopted resolutions terminating defendant Vining and Sullivan as officers and agents of the company in all capacities", (Am. Compl. ¶ 38), which is consistent with the way corporate officers are removed. See N.C. Gen. Stat. § 55-8-43(b) ("An officer may be removed at

---

[10]    Plaintiff asserts this claim against "defendants", which presumably includes defendant Sullivan. However, defendants only seek to dismiss this claim against defendants Vradenburgh and Pitts.

any time with or without cause by (i) the board of directors (ii) the appointing officer, unless the bylaws or the board of directors provide otherwise, or (iii) any other officer if authorized by the bylaws or the board of directors."). In contrast, "Corkum issued notices terminating the employment of defendants Pitts and Vradenburgh", (Am. Compl. ¶ 38), which suggests that defendants Pitts and Vradenburgh were merely employees.[11]

Plaintiff argues that defendants Vradengurgh and Pitts qualify as officers under the North Carolina Business Corporation Act because it has alleged that they are highly compensated senior executive officers. However, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions." Twombly, 550 U.S. at 555 (internal quotations omitted).

Accordingly, defendants' motion to dismiss is granted in this part, and plaintiff's bad faith claims against defendants Vradenburgh and Pitts are dismissed without prejudice.

7.     Breach of Fiduciary Duty and Conflict of Interest

Defendant Vining moves to dismiss plaintiff's claims asserted against him under North Carolina General Statute §§ 55-8-30 and 55-8-31.

The North Carolina Business Corporation Act codifies a director's fiduciary duties to a corporation, providing that a director shall discharge his duties: "(1) In good faith. (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances. (3) In a manner the director reasonably believes to be in the best interests of the corporation." N.C.

---

[11]     In briefing, plaintiff agues "[i]n reality, anyone who chooses to be employed as an officer of a corporation owes common law fiduciary duty and statutory good faith obligations to their employer." (Mem. (DE 37) at 17). Yet, plaintiff's claim is expressly grounded in the North Carolina Business Corporation Act, not the common law. Therefore, at this juncture the court does not consider whether plaintiff states a claim for common law breach of fiduciary duty against defendants Vrandenburg and Pitts.

Gen. Stat. § 55-8-30. The Act also governs conflict of interest transactions, which it defines as a "transaction with the corporation in which a director of the corporation has a direct or indirect interest." Id. § 55-8-31(a). However, "[a] conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:"

> (1) The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee or subcommittee of the board of directors and the board of directors, or the committee or subcommittee of the board of directors, authorized, approved, or ratified the transaction.

> (2) The material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction.

> (3) The transaction was fair to the corporation.

N.C. Gen. Stat. § 55-8-31(a).

When interpreting North Carolina General Statute § 55-30(b)[12], the predecessor to North Carolina General Statute § 55-8-31, the North Carolina Supreme Court held it is a breach of fiduciary duty for an officer or director to usurp a corporate opportunity. Meiselman v. Meiselman 309 N.C. 279 (1983). The court explained:

> The doctrine of corporate opportunity is a species of the duty of a fiduciary to act with undivided loyalty; it is one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relations with the corporation that he represents; in general, a corporate officer or director is under a

---

[12] The predecessor provision provided in pertinent part:

(b) No corporate transaction in which a director has an adverse interest is either void or voidable, if:

(3) The adversely interested party proves that the transaction was just and reasonable to the corporation at the time when entered into or approved. In the case of compensation paid or voted for services of a director as director or as officer or employee the standard of what is "just and reasonable" is what would be paid for such services at arm's length under competitive conditions.

N.C.G.S. § 55–30(b)(3).

fiduciary obligation not to divert a corporate business opportunity for his own personal gain. In other words, the corporate opportunity doctrine provides that a corporate fiduciary may not appropriate to himself an opportunity that rightfully belongs to his corporation.

Id. at 307–08 (quotation marks omitted). Factors to be weighed in determining whether a corporate opportunity has been usurped include:

> 1) the ability, financial or otherwise, of the corporation to take advantage of the opportunity;
> 2) whether the corporation engaged in prior negotiations for the opportunity;
> 3) whether the corporate director or officer was made aware of the opportunity by virtue of his or her fiduciary position;
> 4) whether the existence of the opportunity was disclosed to the corporation;
> 5) whether the corporation rejected the opportunity; and
> 6) whether the corporate facilities were used to acquire the opportunity."

Id. (citation omitted).

Applying the Meiselman factors, at this preliminary stage, plaintiff has sufficiently alleged that defendant Vining breached his fiduciary duty to plaintiff by usurping a corporate opportunity—the opportunity to become a member and manager of defendant Oak City. Here, plaintiff alleges that Defendant Vining acted in bad faith and engaged in unfair conflict of interest transaction by "forming defendant Oak City", "using plaintiff's money, equipment, employees, and facility to operate defendant Oak City", and "attempting to divert plaintiff's corporate business opportunities to defendant Oak City."[13] (Am. Compl. ¶ 28). Moreover, it can be plausibly inferred that the corporate opportunity was not disclosed to plaintiff, and plaintiff did not otherwise reject the opportunity, where plaintiff alleges that the formation of defendant Oak City was part of a

---

[13]     The court does not address plaintiff's allegations that defendant Vining infringed upon the LStar Marks, misappropriated the LStar Trade Secrets, or encouraged parties to breach contracts with plaintiff, where, as discussed in more detail herein, plaintiff fails to state a claim for trademark infringement, misappropriation of trade secrets, and tortious interference with contract.

"clandestine scheme to divert plaintiff's future business opportunities." (Id. ¶ 34).[14]  Therefore, plaintiff plausibly alleges a claim for breach of fiduciary duty against defendant Vininig.

Plaintiff also alleges that defendant Vining entered into conflict of interest transactions with plaintiff.  Specifically, plaintiff alleges that "defendant Vining purport[ed] to cause plaintiff to enter deferred payment agreements with defendant Vining . . . and the purported deferred payment agreement presented substantial conflicts of interest with rights and interests of plaintiff at the time that these agreements were allegedly formed" and "during the months of November 2019, December 2019 and January 2020, [defendant Vining] divert[ed] hundreds of thousands of dollars of plaintiff's money to himself."  (Am. Compl. ¶ 86).  Thus, plaintiff has sufficiently alleged that it entered into multiple transactions with defendant Vining, in which defendant Vining had a direct financial interest.   Defendant Vining's argument—that plaintiff fails to identify a single transaction between plaintiff and defendant Vining—is unpersuasive in light of the alleged transactions discussed above.

Accordingly, defendants' motion to dismiss is denied in this part.

8.     Constructive Trust

Defendants move to dismiss plaintiff's claim for a constructive trust, arguing that is a remedy and not a cause of action.

---

[14]     Defendant Vining argues that plaintiff's allegations of bad faith are conclusory, relying upon Winters v. First Union Corp., No. 01-CVS-5362, 2001 WL 34000144 (N.C. Super. July 12, 2001) and In re Hickory Printing Grp., Inc., 469 B.R. 623 (Bankr. W.D.N.C. 2012).  Unlike here, where plaintiff specifically alleges that defendant Vining acted in bad faith and in his own self interest, in Winters, the court found "there is no factual allegation that Defendants acted in self-interest, in bad faith, or that directors did not believe they were acting in the best interest of the company." 2001 WL 34000144, at *4.  Moreover, in In re Hickory Printing Grp., the court actually held that plaintiff sufficiently alleged breach of fiduciary duty.  469 B.R. at 626.

Under North Carolina law, a constructive trust is a remedy for certain wrongs, such as breach of a duty, rather than an independent cause of action. See Roper v. Edwards, 323 N.C. 461, 464 (1988) ("A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." (citing Wilson v. Dev. Co., 276 N.C. 198, 211-12 (1970)); New Amsterdam Cas. Co. v. Waller, 301 F.2d 839, 842 (4th Cir. 1962) ("A constructive trust is merely a procedural device by which a court of equity may rectify certain wrongs. It is suggestive of a power which a court of equity may exercise in an appropriate case, but it is not a designation of the cause of action which justifies an exercise of the power." (applying North Carolina law)).

Where constructive trust is a remedy for an alleged breach of duty, and where plaintiff's claim for breach of fiduciary duty is allowed to proceed against defendant Vining, the court will not dismiss this "claim," but will instead consider the appropriateness of a constructive trust as part of plaintiff's prayer for relief at the appropriate time.

9.  Civil Conspiracy

"A civil action for conspiracy is an action for damages resulting from acts committed by one or more of the conspirators pursuant to the formed conspiracy, rather than the conspiracy itself." Burton v. Dixon, 259 N.C. 473, 476 (1963); see Shope v. Boyer, 268 N.C. 401, 405 (1966) ("[T]here is no such thing as a civil action for conspiracy. The action is for damages caused by acts committed pursuant to a formed conspiracy, rather than by the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil

action lies against anyone."); see also Dove v. Harvey, 168 N.C. App. 687, 690 (2005) ("[T]here is not a separate civil action for civil conspiracy in North Carolina." (citations omitted)).

A civil conspiracy, as a theory of liability, includes the following elements: "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." Krawiec, 370 N.C. at 614 (quoting State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 444 (2008)). "In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts." Shope v. Boyer, 268 N.C. 401, 405 (1966); Reid v. Holden, 242 N.C. 408, 414–15 (1955).

Plaintiff plausibly alleges a civil conspiracy. In particular, plaintiff alleges that after Corkum moved to Boston, defendants "conspired, developed and implemented an unlawful scheme to remove plaintiff from being able to control his company and to misappropriate plaintiff's money, property, and business opportunities to their personal benefit." (Am. Compl. ¶ 30). Shortly thereafter, defendant Vining allegedly provided Corkum with notice that he had been removed from plaintiff in all official capacities, and the individual defendants formed defendant Oak City, allegedly using plaintiff's facility, equipment, property, and money. (Id. ¶¶ 31, 34-35). Finally, defendants allegedly attempted to solicit business for defendant Oak City by representing to prospective clients that defendant Oak City developed three of plaintiff's real estate projects. (Id. ¶¶ 35.3-35.4).

Contrary to defendants' argument in briefing, the foregoing allegations are not boilerplate. See Burton, 259 N.C. at 477 ("It is alleged that plaintiff and her husband, acting together, invited C. P. Wilson to live with them for the purpose of gaining control of his assets and converting them to their own use, they persuaded C. P. Wilson to execute to the husband a general power of attorney and by means thereof sold timber and collected rents belonging to C. P. Wilson, and they converted

the proceeds of the timber and rents to their own use. This is a sufficient statement of a cause of action for conspiracy.").  Accordingly, these allegations, which also underlie plaintiff's unfair and deceptive trade practices claim, give rise to a civil conspiracy theory of relief, and defendants' motion to dismiss is denied in this part.

10. Declaratory Judgment

Defendants move to dismiss plaintiff's declaratory judgment claim.  As relevant here, plaintiff seeks: "[a] judgment declaring that all ownership rights and interests that Attorney Vining purports to hold in plaintiff's shares of stock are void in all respects" and "[a] judgment declaring that claimants had no authority to cause plaintiff to enter a deferred payment agreements with defendants, and all such purported actions are void in all respects."  (Am. Compl. ¶¶ 167.1-167.2). Defendants argue that this claim was asserted in anticipation of the related wage and hour case that defendants initiated against plaintiff, and as a result, plaintiff should assert this claim as a defense in the related wage and hour case.    However, defendant Vining is not a party to that case. Accordingly, the court denies defendants' motion to dismiss in this part.

11. Remaining State Law Claims

In the event that the court dismisses all federal claims, defendants request that the court decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims.  Where plaintiff states a claim for false advertising and false designation of origin under the Lanham Act, defendants' motion to dismiss is denied in this part.

**CONCLUSION**

Based on the foregoing, defendants' motions to dismiss (DE 29, 30) are GRANTED IN PART and DENIED IN PART.

Plaintiff's claims for trademark infringement under the Lanham Act, common law unfair competition and infringement, misappropriation of trade secrets, and tortious interference with contract against all defendants, as well as plaintiff's claim for bad faith against defendants Pitts and Vradenburgh, are DISMISSED WITHOUT PREJUDICE.

Plaintiff's claims for false advertising and false designation of origin under the Lanham Act, as limited herein, as well as unfair and deceptive trade practices, declaratory judgment, and breach of fiduciary duty against all defendants; bad faith against defendant Sullivan; and conflict of interest against defendant Vining are ALLOWED TO PROCEED.  Additionally, plaintiff may request a constructive trust in the prayer for relief, and civil conspiracy remains a viable legal theory for damages.

Pursuant to Rule 12(a)(4)(A), defendants' responsive pleadings must be served within 14 days of this order.  Thereupon, the court will enter such further order as is warranted regarding case planning and scheduling.

SO ORDERED, this the 23rd day of September, 2021.


_____
LOUISE W. FLANAGAN
United States District Judge